**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Donnie FOSTER, Defendant–Appellant.**

No. 88–8277.

United States Court of Appeals, Eleventh Circuit.

Dec. 6, 1989.

---

Benjamin S. Waxman, Weiner, Robbins, Tunkey & Ross, P.A., Miami, Fla., for defendant-appellant.

Arthur W. Leach and Joseph D. Newman, Asst. U.S. Attys., Savannah, Ga., for plaintiff-appellee.

Before KRAVITCH, Circuit Judge, HILL[*], Senior Circuit Judge, and FREEMAN[**], District Judge.

## I. FACTS

HILL, Senior Circuit Judge:

### A. The Conviction.

On September 30, 1987, DEA Agent Darrell Snider received a tip that three individuals would arrive later that day on an Eastern Airlines flight from Miami to the Savannah, Georgia Airport, carrying cocaine. These individuals were later identified as Donnie Foster (the defendant in this case), Stephanie Davis and Jeffrey Smith. Ms. Davis is Mr. Smith's cousin and, purportedly, was Mr. Foster's girlfriend. Their tickets—issued in the names of D. Jones, S. Jones, and J. Jackson—seated the three next to each other on the flight. The three were preparing to depart from the Savannah Airport in the same cab when they were questioned by Agent Snider.

After Snider inquired as to a discrepancy between the names listed on Ms. Davis' identification materials and those listed on her airline ticket, and the fact that the two men purported not to carry any identification, a consensual search in a nearby office revealed one kilogram of cocaine hidden in a girdle worn by Ms. Davis. Mr. Foster thereafter spontaneously claimed that he did not know Ms. Davis.

Foster was charged with (1) possessing cocaine on or about September 30, 1987, with intent to distribute; (2) participating in a conspiracy to possess and distribute cocaine on or about September 30, 1987,

---

[*] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Richard C. Freeman, U.S. District Judge for the Northern District of Georgia, sitting by designation.

with "the exact beginning date being to the Grand Jury unknown"; and (3) travelling in interstate commerce to promote cocaine distribution. *See* 21 U.S.C. § 841(a)(1); 21 U.S.C. § 846; 18 U.S.C. § 1952.

Ms. Davis agreed to testify at trial against Mr. Foster in exchange for substantial concessions by the government in its prosecution of her. Davis claimed at trial that Foster, her boyfriend of nearly a year, planned, directed, and otherwise controlled her actions in transporting the cocaine on September 30, 1987.

Ms. Davis also testified that on September 13, 1987, she carried drugs at Mr. Foster's direction in the same girdle while flying from Miami to Savannah in the company of Mr. Foster's sister, Lisa Foster. Davis related that Mr. Foster's sister had at his behest furnished Davis with the girdle used to smuggle the cocaine on both occasions. Mr. Foster met Ms. Davis and his sister at the Savannah Airport on September 13, 1987, took the package containing the cocaine, and departed. Foster paid Davis $500.00 on both occasions for carrying the cocaine. Ms. Davis had no other connection to the cocaine on either occasion.

The thrust of Mr. Foster's defense was an attempt to impeach Ms. Davis' testimony by demonstrating to the jury that Ms. Davis was untrustworthy in general and that she testified falsely in order to shift the responsibility for the cocaine from her cousin and herself to Mr. Foster.

The jury found Foster guilty on all three counts.

## B. *The Sentence.*

After he was convicted but before Mr. Foster was sentenced, he entered into an agreement with the government to submit to a post-verdict debriefing by DEA Agent Snider regarding his role in drug trafficking in Florida and Georgia. In exchange, the government agreed to inform the district court of Mr. Foster's cooperation in connection with his sentencing. The government also agreed that none of the information disclosed by Foster in the post-verdict debriefing would be used against him in any criminal case.

Notwithstanding this agreement, the government revealed (apparently deliberately) information derived from the debriefing to the probation office in charge of Mr. Foster's presentence investigation. Those facts were recited in a supplemental memorandum that was appended to the presentence investigation report and given to the district court judge in charge of the case. This information indicated that Mr. Foster had a greater involvement in drug trafficking than was suggested at trial.

Mr. Foster sent a letter to the probation office objecting to the inclusion of this information. Foster also moved at the sentencing hearing that such information be stricken from the presentence report and the judge should not consider it. Judge Edenfield agreed to strike the information but frankly admitted that he could not "unlearn" this material.[1] Foster was sentenced to twenty year prison terms for the first two counts and five years on the third count, with all sentences to run concurrently.

## II. ISSUES PRESENTED AND PROCEEDINGS IN THE DISTRICT COURT

### A. *The Admissibility of Evidence Relating to the Earlier, September 13, 1987 Trip.*

Foster presents two issues on appeal. First, he argues that the district court

---

1. Judge Edenfield made the following comments regarding the information disclosed from Mr. Foster's debriefing by the government.

 I can say this: I will grant [the motion to strike], but how does one unlearn something that has been sent to him. First of all, I am not going to tell you that I can remove that from my mind, but I can assure you and the defendant I have heard testimony. I think he was a major cocaine dealer and that I was going to sentence accordingly.

 A short time later, Judge Edenfield further explained his comments.

 Whatever one can see can never be taken away, you know. But insofar as I know, that has not and will not influence the sentence. I had already arrived at one before that, and when I look at the record here I have determined that what you would call a "stiff sentence" was in order.

 Sentencing Transcript at 5–6.

erred by failing to grant his motion for a mistrial following the admission of evidence concerning Mr. Foster's involvement in the September 13, 1987, uncharged narcotics transaction. At trial, Foster objected to the testimony concerning the September 13th transaction on the basis of surprise. Our reading of the trial transcript satisfies us that this objection was adequately dispensed with at trial.[2]

On appeal, Foster contends that regardless of whether he was unfairly surprised by this testimony, it was inadmissible under Fed.R.Evid. 404(b) as unduly prejudicial extrinsic offense evidence. Thus, according to Foster the district court abused its discretion by refusing to grant a mistrial after this evidence was heard by the jury and later mentioned by the prosecution in its closing rebuttal, despite the fact that the judge told the prosecution to "stay away" from the September 13th transaction during a sidebar in which Foster lodged his objection to the continuation of that line of questioning on the basis of surprise.

### B. The Government's Breach of Its Agreement.

Second, Foster argues that the district court abused its discretion by failing to reassign the case to another judge for sentencing since the district judge had read the information derived from Foster's debriefing which had been inserted into the presentence investigation report. Although Judge Edenfield agreed to strike this material and stated that "insofar as [he] kn[e]w" he was not influenced by the material and had reached a tentative conclusion without the aid of the information, he frankly admitted that he could not "unlearn" the information derived from Mr. Foster in violation of his agreement with the government. Mr. Foster did not make a formal request that the judge recuse himself.

## III. DISCUSSION

### A. The Admissibility of "Other Crimes" or "Prior Acts" Evidence.

Foster claims that the testimony regarding his involvement in the September 13th cocaine transaction went solely to his bad character and propensity to traffick in cocaine, and that the prejudice he suffered from the admission of this evidence outweighed its probity and violated Fed.R. Evid. 404(b).[3] The government responds that evidence concerning Foster's involvement in the smuggling of cocaine by means of the same modus operandi used in the transaction for which he was arrested only seventeen days later, was "inextricably intertwined" with the conspiracy charge as well as the other substantive offenses occurring on September 30, 1987. Second, the government claims that even if this evidence was not "inextricably intertwined" with charged offenses, it was admissible under Fed.R.Evid. 404(b).[4]

2. Prior to trial, Foster filed various pretrial discovery motions, including a *Motion for Prompt and Early Disclosure of Rule 404(b) Evidence,* a Motion for Rehearing on the Existence of a Conspiratorial Agreement and the Connection Thereto to the Defendants as Charged in Indictment. The government responded by pledging an "open file policy" with regard to these requests. Sometime during the middle of Ms. Davis' testimony regarding the September 13th trip in which she carried cocaine from Miami to Savannah at Mr. Foster's direction, counsel for Mr. Foster called a sidebar in which he complained that the government had violated its "open file policy" by not notifying the defense that it intended to introduce testimony concerning the September 13th transaction. The prosecutor responded that he was unaware of the September 13th transaction until the morning of trial, when he pressed Ms. Davis to be completely truthful regarding all aspects of the case since she had been tested positive a few days earlier for cocaine consumption. The district court judge was satisfied that the prosecutor did not know of the September 13th transaction before the first day of trial.

3. The full text of Fed.R.Evid. 404(b) reads:
 Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

4. The government also contends that since the indictment stated that the conspiracy count be-

### 1. "Inextricably Intertwined" Evidence

■ Evidence that forms "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted" is admissible even if it tends to reflect negatively on the defendant's character. In *United States v. Costa*, 691 F.2d 1358 (11th Cir.1982), for example, Costa and a codefendant were charged with possession, and conspiracy to possess, cocaine with intent to distribute. The codefendant cooperated with authorities and testified that Costa was his source for the cocaine. The co-defendant also testified at trial concerning his previous cocaine trafficking activities with Costa. On appeal, this court rejected the Rule 404(b) challenge and held that the testimony was "inextricably intertwined" as an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which Costa was indicted. *Id.* at 1361. *See United States v. Males*, 715 F.2d 568 (11th Cir. 1983) (testimony concerning prior drug transactions between witness and defendant elicited to show identical manner of delivery and to explain why defendant would have "fronted" cocaine to witness); *cf. United States v. Zelinka*, 862 F.2d 92, 99 (6th Cir.1988) (evidence of defendant's possession of cocaine at time of arrest was not relevant in prosecution for conspiracy to distribute cocaine taking place 17 months prior to arrest). *Costa* controls the admission of testimony concerning the September 13th transaction in this case.

■ As Foster readily admits, the central issue at trial was whether he was simply "along for the ride" on September 30th, or whether he actively participated in the smuggling of the cocaine with intent to distribute it. Testimony concerning the September 13th trip did not merely implicate Mr. Foster's bad character or propensity to traffic in drugs, it specifically described his participation in a scheme involving the *same* mode of transportation (a commercial airline) between the *same* cities (Miami and Savannah), to smuggle the *same* amount (one kilogram) of the *same* drug (cocaine), in the *same* manner of hiding it (in a girdle) on the *same* person (Ms. Davis)—only 17 days prior to his arrest for a virtually identical transaction. Ms. Davis testified that Mr. Foster made these arrangements, met Ms. Davis and his sister at the Savannah Airport, took the cocaine from them, and departed alone with the cocaine. Trial Transcript at 81–83.

Not only was the September 13th testimony relevant to Mr. Foster's opportunity, intent, preparation, planning, and knowledge of the circumstances surrounding the conspiracy to distribute cocaine and the actual possession with intent to distribute on September 30th—traditional Rule 404(b) purposes—it was also necessary to explain why Davis agreed to carry the cocaine during the September 30th trip. *See United States v. Leichtman*, 742 F.2d 598, 604 (11th Cir.1984) (evidence of marijuana transaction necessary to complete story of kidnapping for which defendants were charged); *Males*, 715 F.2d at 571 (testimony of prior drug transactions between witness and defendant necessary to understand why defendant would "front" cocaine to witness). Ms. Davis' explanation of the September 13th transaction was necessary in order for the jury to understand why Davis agreed to hide the cocaine for Mr. Foster on the September 30th trip with little or no advance notice or apparent reflection on her part. Evidence concerning the success of the September 13th venture and the payment of $500.00 from Foster to Davis explains her willingness to participate in the September 30th transaction.

If believed by the jury, the September 13th testimony establishes that Foster had knowledge of the particular mode of smuggling cocaine used on September 30th, that he participated in the planning and prepara-

gan "on or about the 30th day of September, 1987, and prior thereto, the exact beginning date being to the Grand Jury unknown," the indictment placed Foster on notice that the starting date of the conspiracy was not known, and that the uncharged incident on September 13th was an overt act in furtherance of the conspiracy charged. Since we find that the testimony concerning the September 13th air smuggling was "inextricably intertwined" with the conspiracy charge and the substantive offenses, we need not reach this issue.

tion of the scheme, and, in conjunction with the September 30th evidence gathered independent of Ms. Davis' testimony, formed an intent to distribute cocaine. Such evidence related to elements of the crimes charged not because it demonstrated Mr. Foster's propensity to traffick in drugs at a time, place, or manner remote from the offenses for which he was charged, but precisely because the evidence related directly to the crimes charged.

As this court stated in *Costa* and *Males*, if the evidence is "inextricably intertwined" as "an integral and natural part of the witnesses' accounts of the circumstances surrounding the offenses for which the defendant was indicted," the evidence is not "extrinsic" and therefore "Rule 404(b) [does] not come into play." *Males*, 715 F.2d at 571; *Costa*, 691 F.2d at 1361.

### 2. Rule 404(b) Analysis

If the evidence regarding other offenses committed by the defendant *is* "extrinsic" to the crimes charged, on the other hand, the trial court must apply the two-step test of *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979):[5]

First, it must be determined that the extrinsic evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess proba-

tive value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403. (Footnote omitted). Juxtaposed against the relatively high probative value of the evidence concerning the September 13th trip, as discussed *supra*, is the somewhat precarious nature of the potential prejudice suffered by Foster as a result of the testimony. Unlike objectively substantiated testimony or other evidence of a conviction for a prior criminal act, Ms. Davis' allegations with regard to the uncharged September 13th cocaine transaction were not established by a jury's finding of guilt beyond a reasonable doubt or a guilty plea by the defendant. On the contrary, such allegations were open to the introduction of inconsistent evidence or cross-examination by the defense—options declined in this case—and to attempts by the defense to discredit the witness's veracity in general—a strategy pursued with vengeance in this case.

Indeed, even assuming that the testimony was "extrinsic" to the offenses charged, the prejudice suffered was dependent solely on whether the jury believed Ms. Davis with regard to the September 13th transaction. If the jury believed Ms. Davis with regard to the September 13th transaction, it seems highly implausible that it would disbelieve her testimony regarding the September 30th trip. Conversely, if the jury did not believe Ms. Davis with regard to

**5.** Although not often articulated in the cases, there are distinctions between "inextricably intertwined" and "extrinsic" evidence concerning prior acts in addition to the obvious difference in the actual relevance of each type of evidence to the offenses that are the subject of the trial at hand. First, if the evidence is "inextricably intertwined" because it forms a natural and necessary part of the witness's testimony regarding the charged offenses, the trial judge need not formally weigh its probity against its potential prejudice under Rule 404(b). As explained in *Males, supra*, 715 F.2d at 571, and *Costa, supra*, 691 F.2d at 1361, if the evidence is "inextricably intertwined," Rule 404(b) does not come into play. Indeed, often, as in this case, the "inextricably intertwined" evidence of prior acts is extremely, if not ultimately, prejudicial as to the jury's understanding of the defendant's guilt. This does not effect the propriety of admitting such evidence.

Second, prior acts evidence can on occasion be only mildly probative of the crime(s) charged but crucially necessary to the jury's understanding of the witness's veracity or to make testimony understandable. Under such conditions, the evidence may be "inextricable intertwined" and therefore not subject to a balancing test under Rule 404(b). This will of course be the exception and not the rule since probity of the crime(s) charged is a natural hallmark of intertwined evidence. In such a case, special instructions may be necessary to caution the jury not to consider such evidence as reflecting on the defendant's character or propensity to commit the crime(s) charged.

Finally, it is of course self-evident that evidence of prior acts that is not necessary to an understanding of the witness's testimony or does not share a sufficient amount of parallelism to be deemed "inextricably intertwined," might conceivably pass Rule 404(b) muster if its probity outweighs potential prejudice.

the September 30th transaction—independent of her testimony with regard to the September 13th transaction—the jury would not likely believe Ms. Davis' testimony regarding the September 13th trip. In other words, while Ms. Davis' accounts of the September 13th and September 30th trips surely reinforced the jury's belief of the allegations regarding each transaction in particular, the prejudice suffered by Foster depended upon Ms. Davis' credibility—*not* specifically on any "objective" facts (e.g., the discovery of a prior conviction or some sort of objective evidence suggesting the truth of her assertions) discovered as a result of the testimony which concerned the September 13th trip.

In any event, even if the testimony regarding the September 13th transaction had resulted in the discovery of objective or at least independently substantiated evidence of Foster's involvement in an air smuggling scheme virtually identical to the one with which he was charged only seventeen days later—and thus the potential prejudice had been greater, this court could not find that the admission of such evidence would be an abuse of the trial court's discretion in balancing its probity against the potential prejudice. *See United States v. Kerris,* 748 F.2d 610, 614 (11th Cir.1984) (abuse of discretion standard applies to Rule 404(b) evidentiary rulings).

In sum, we hold that the evidence regarding the September 13th trip was "inextricably intertwined" with Ms. Davis' testimony regarding the September 30th trip, thus Rule 404(b) does not apply. *See Males,* 715 F.2d at 571; and *Costa,* 691 F.2d at 1361. We also find that even if the September 13th testimony was *not* "inextricably intertwined," the trial court did not abuse its discretion in admitting such evidence at certain points during the trial and in failing to grant a mistrial.

B. *The Proper Remedy for the Government's Breach of Its Agreement Not to Use Information Disclosed at the Debriefing.*

■ As recounted in the facts above, after he was convicted but before he was sentenced, Mr. Foster agreed to meet with DEA Agent Snider to explain truthfully his involvement in drug-trafficking activities. The government explicitly agreed not to use any information or documents disclosed by Mr. Foster in his debriefing by the DEA. Notwithstanding this, much of the information disclosed in the debriefing by Mr. Foster, which indicated a greater involvement in drug trafficking than suggested at trial, was recited in a supplemental memorandum and appended to the pre-sentence investigation report sent to the district judge.

We deal here with a direct breach of an agreement between the defendant and the government. The government concedes as much and merely argues in its brief that "Foster was entitled to no more than what the district court said and did in the instant case." We disagree. As this court stated in *United States v. Tobon–Hernandez,* 845 F.2d 277, 280 (11th Cir.1988): "In this case we do not address the district court's exercise of discretion in imposing a sentence. Rather, we focus on the government's violation of its plea agreement."

The cases relied upon by the government to suggest that the district judge's grant of the motion to strike the material and his statement that he did not or would not, to the best of his knowledge, allow the information to influence him, are factually inapposite. *See, e.g., United States v. Stephens,* 699 F.2d 534 (11th Cir.1983) (trial court's failure to resolve dispute concerning facts brought to its attention at sentencing not sufficient to require resentencing). The cases relied upon by the government have no applicability where the government acts in direct violation of its agreement.

In this case, after agreeing that the government had breached its agreement, the trial judge stated that although he could not erase the information from his mind, he did not believe that he was influenced by the information in determining the appropriate sentence.[6] As the Supreme

---

6. In making these statements, Judge Edenfield was forthright in admitting that the one can, to

Court held in *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971), it makes no difference whether the judge was (or was not) influenced by information divulged through the government's breach.

> [W]e conclude that the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises made in the negotiation of pleas of guilty will be best served by ... [allowing the trial judge to choose between] specific performance of the agreement on the plea, in which case petitioner should be resentenced by a different judge, or ... [granting the petitioner] the opportunity to withdraw his plea of guilty.

*Id.* at 262–63, 92 S.Ct. at 498–99 (footnote omitted). Similarly, this court held in *Tobon–Hernandez*, 845 F.2d at 280, and *United States v. Nelson*, 837 F.2d 1519, 1522 and 1525 (11th Cir.1988), that when the government breaches an agreement, the defendant must either be resentenced by a new judge or allowed to withdraw his plea, regardless of whether the judge was influenced.

This case parallels *Santobello, Tobon–Hernandez,* and *Nelson* in that the government breached its agreement by disclosing facts or taking a position at sentencing that is completely inconsistent with its agreement with the defendant. This case differs only in that Mr. Foster did not exchange a guilty plea for the government's agreement to conduct itself in a certain manner with

regard to sentencing. Instead, Foster agreed post-trial to provide the government with truthful information concerning certain drug trafficking operations in Florida and Georgia. Under these circumstances, the only available and sufficient remedy is to require specific performance of the agreement, which means that Mr. Foster must be resentenced by a different judge.[7]

Mr. Foster's conviction is AFFIRMED; his sentence is VACATED; and the case is REMANDED to the district court for assignment to a different judge for resentencing.

---

the best of his knowledge, resist the influence of learning relevant information before making a decision in which a certain amount of discretion is afforded; but one cannot "erase" such information. This latter trait of the human mind, together with the existence of a deliberate breach by the government, explains and justifies the Supreme Court's prophylactic rule of disregarding the very real possibility that the sentencing judge is not influenced by the information disclosed after the government breaches an agreement. We stress that Judge Edenfield did in no way err in his good faith attempt to erase the ill effects of the government's error in this case.

7. As discussed in the text, under applicable case law, the only available, sufficient remedy for the government's breach in this case is a sen-

tencing determination by a judge who lacks knowledge of the information obtained by the government in the debriefing. We note that Mr. Foster moved the district court (1) to strike the information from the presentence report, and (2) "not to consider any of that information against him." He did not make a formal request for recusal. Sentencing Transcript at 4.

Since, as Judge Edenfield correctly admitted, he could not "unconsider" the information, we interpret the unique facts and record before us to contain a constructive request for recusal or sentencing by a judge who did not have knowledge of the tainted information. We simply cannot conscion the government's deliberate breach on the basis of a highly formalistic error in failing to invoke the "magic words."